SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff-Appellee,

v.

COMMONWEALTH CHEMICAL
SECURITIES, INC., et al.,
Defendants-Appellants.

No. 496, Docket 76–6175.

United States Court of Appeals,
Second Circuit.

Argued Dec. 8, 1977.

Decided March 3, 1978.

Michael C. Devine, New York City (Schwenke & Devine, and Richard W. Lyon, New York City, of counsel), for defendants-appellants.

David Ferber, Sol. to the Commission, and Frederick B. Wade, Sp. Counsel, Securities and Exchange Commission, Washington, D. C. (Howard B. Scherer and Angela M. Desmond, Securities and Exchange Commission, Washington, D. C., of counsel), for plaintiff-appellee.

Before FRIENDLY, SMITH and MESKILL, Circuit Judges.

FRIENDLY, Circuit Judge:

This action by the Securities and Exchange Commission (SEC) in the District Court for the Southern District of New York arises from an offering of 50,000 units of common stock and redeemable purchase warrants of Beneficial Labs, Inc. (BL) made by Commonwealth Chemical Securities, Inc. (CCS) on a "best efforts—all or none basis," and an additional 50,000 units on a "best efforts" basis in the go-go market of late 1971 and early 1972. The offering circular, issued pursuant to SEC Regulation A under the Securities Act of 1933, must be read to be believed. It described BL as having 250,000 outstanding shares of common stock, 236,000 of which were owned by officers and directors.[1] In contrast to this impressive capitalization BL had net tangible

---

1. John Feldman, the President and Treasurer, who had been engaged "in the practice of pharmacy as an employee in privately owned pharmacies," owned 215,000 shares; he was to receive an annual salary of $15,000 commencing on the date when BL acquired an operating property. He is the brother-in-law of defendant Drucker.

assets of $4,750 or 2¢ per share. If the minimum of 50,000 units had been sold at the offering price of $2.25 per share, BL, after paying underwriting commissions to CCS and other expenses, would have had net tangible assets of $83,500 or 28¢ per share. The result, all clearly stated in the Offering Circular, would have been to increase the equity of existing shareholders from 2¢ to 28¢ per share, whereas the purchasers' investment of $2.25 per unit would have dwindled to the same amount. The rare opportunity offered as an inducement was that BL, which had engaged in no business and had no corporate headquarters aside from Feldman's residence, intended "to own and operate pharmacies and to operate drug departments in larger units such as department stores and supermarkets" and also "to sell in its pharmacies certain items which it will purchase at wholesale and bottle and sell under its own label." To that end, approximately $25,000 would be allocated to working capital "including officer's salary and general overhead," with $53,750 left available "to make cash down payments on the purchase of pharmacies." The circular did not claim any originality in BL's concepts; on the contrary it conceded, with elaborate detail, that BL "will be faced with very strong competition in its proposed operations." Executives of the many great drug chains of the country or owners of established neighborhood drugstores would hardly have stirred in their sleep at the threat of BL's prospective entry.

The SEC's complaint had three main facets. The first was that although the Offering Circular dated December 20, 1971 had stated:

> At least 50,000 units offered hereby must be sold and paid for or all subscription payments shall be promptly refunded in full without interest.

CCS closed the transaction on the basis of a declaration that 50,650 units had been sold and paid for by March 8, 1972 when in truth and fact they had not been. Here the SEC's major item of evidence was the purported sale of 2,000 units each to four friends of a CCS employee avowedly as nominees for one David Massad in Boston; the units were not paid for before the closing and Drucker repurchased them from Massad two or three weeks thereafter. The second facet was that thereafter the defendants embarked on a course of manipulating BL stock by a campaign of buying and selling which drove the price of BL common stock up to a range of 14–15 by the end of September 1972 and a high of 24½ on January 15, 1973—representing a market value of $7,365,925.

Here the SEC's principal item of evidence was the testimony of a SEC analyst that accounts controlled by the defendants participated in extraordinarily large percentages of all transactions in BL stock, warrants and units—plus the fact that prices rose astronomically although BL reported no earnings through September 1972 and the offering circular had conceded that BL could commence business only on a small scale if only 50,000 units were sold and that failure to sell all 100,000 units might severely limit "the potential of the Company." On March 5, 1973, the SEC suspended trading. When it allowed trading to be resumed on October 31, 1973, there were no reported bids for the stock; in November 1973, two of the mutual funds hereafter mentioned sold their BL stock at prices which, after giving effect to a 100% stock dividend, were less than $1 per share.

Some of the allegedly manipulative transactions were with investment companies to which some defendants were "affiliates" as defined in § 2(a)(2), (3) of the Investment Company Act or an investment adviser as defined in § 2(a)(20) of that Act and § 202(a)(11) of the Investment Advisers Act. These transactions, along with several others, form the basis for the third facet of the SEC complaint, alleging violations of §§ 17(a), 36(a), 37, and 48(a) of the Investment Company Act and § 206(1) and (2) of the Advisers Act. The funds to which some of the defendants were affiliates and advisers were induced to purchase 22,100 shares of BL common and 3,000 warrants at a total cost of $220,137.50 and an ultimate loss of $158,345.

The appellants here are CCS; Robert Drucker, vice president and a director of CCS and owner of ¼ of its shares as well as ⅓ of the shares of a corporation owning ½ of the CCS stock, who at the time of the alleged violations was an officer and director of Vanguard Fund, Inc. (Vanguard) and New York Hedge Fund (Hedge) and president and a director of DK&B Management, Inc. (DK&B); Julius Kleinman, president, treasurer and chairman of the board of directors of CCS, who at the time of the alleged violations was an officer and director of Hedge and Vanguard and vice president, secretary and a director of DK&B; DK&B, which was the registered investment adviser of Hedge from October 24, 1972 to September 22, 1973 and of Vanguard from March 22, 1972 to July 16, 1973; Mary Sharpe, CCS's bookkeeper from August 1970 to June 1974; and Marlene Kleinman, Kleinman's wife. The district court ruled in favor of the SEC on all three of its claims. Specifically it found that the minimum of 50,000 units provided for in the offering had not in fact been sold and that in consequence CCS, Drucker and Kleinman had violated § 17(a) of the 1933 Act, § 10(b) of the 1934 Act and Rules 10b–5 [2] and 10b–6, § 15(c)(2) of the 1934 Act and Rule 15c2–4,[3] and with DK&B, §§ 17(a), 48(a), 36(a) and 37 of the Investment Company Act; that the same defendants and DK&B had violated § 17(a) of the 1933 Act and § 10(b) of the 1934 Act and Rule 10b–5 for manipulating the market in BL shares; that CCS, aided and abetted by Drucker, Kleinman and Sharpe violated SEC bookkeeping rules under the 1934 Act, notably Rule 17a–3(a)(9), since the records reflected fictitious ownership of securities; that DK&B, aided and abetted by Drucker and Kleinman, violated § 206(1) and (2) of the Investment Advisers Act; that Sharpe also violated § 17(a) of the 1933 Act and § 10(b) of the 1934 Act and Rule 10b–5 for her role in the fraudulent closing and the market manipulation; and that Mrs. Kleinman violated these same provisions for her role in the market manipulation. Accordingly it granted the SEC's prayers for an injunction and disgorgement of profits.

Appellants attack these rulings on innumerable grounds. Some of these raise important and recurring issues of law and two raise arguable questions of the sufficiency of evidence. We shall limit ourselves to the points which we believe to merit discussion by us; for the balance we rest on the excellent opinion of Judge MacMahon.

## DISCUSSION

I. *Defendants' asserted right to a jury trial.*

Defendants had made the jury demand required by F.R.Civ.P. 38(b). The judge

---

**2.** While the court below did not expressly state that these defendants violated Rule 10b–5 by their participation in the fraudulent closing, the court did state that defendants Sharpe and Guttman had aided and abetted their Rule 10b–5 violation. Since Judge MacMahon's opinion fully elaborates the factual and legal predicates of such a violation, we think this a clear finding that CCS, Drucker, and Kleinman had indeed breached the rule.

**3.** This provides:
It shall constitute a "fraudulent, deceptive or manipulative act or practice" as used in section 15(c)(2) of the Act, for any broker or dealer participating in any distribution of securities, other than a firm-commitment underwriting, to accept any part of the sale price of any security being distributed unless:
(a) The money or other consideration received is promptly transmitted to the persons entitled thereto; or

(b) If the distribution is being made on an "all-or-none" basis, or on any other basis which contemplates that payment is not to be made to the person on whose behalf the distribution is being made until some further event or contingency occurs, (1) the money or other consideration received is promptly deposited in a separate bank account, as agent or trustee for the persons who have the beneficial interests therein, until the appropriate event or contingency has occurred, and then the funds are promptly transmitted or returned to the persons entitled thereto, or (2) all such funds are promptly transmitted to a bank which has agreed in writing to hold all such funds in escrow for the persons who have the beneficial interests therein and to transmit or return such funds directly to the persons entitled thereto when the appropriate event or contingency has occurred.

struck it *sua sponte*. This, appellants claim, was error.

■ The claim seems surprising since it has been assumed for decades that a suit for an injunction, whether by the Government or a private party, was the antithesis of a suit "at common law" in which the Seventh Amendment requires that the right to trial by jury "shall be preserved." In 1791, when the Seventh Amendment became effective, injunctions, both in England and in this country, were the business of courts of equity, not of courts of common law. Although the entitlement to a jury trial extends to many rights that were not recognized in 1791, e. g., the special liability of the seller of a product for physical harm to a user or consumer, see ALI, Restatement of Torts 2d, § 402A (1965), or an action for damages based upon a statute creating a tort unknown to the common law, see, *Curtis v. Loether,* 415 U.S. 189, 195 & n.10, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974), the test remains "whether the action involves *rights and remedies of the sort* traditionally enforced in an action at law, rather than in an action in equity or admiralty." *Pernell v. Southall Realty,* 416 U.S. 363, 375, 94 S.Ct. 1723, 1729, 40 L.Ed.2d 198 (1974) (emphasis supplied). Not disputing this traditional learning, appellants claim it does not govern here on two accounts.

The first is that the SEC's demand was not simply for an injunction but also for disgorgement of profits; indeed it would probably not be going too far to suppose that in this case the SEC was more interested in the latter remedy than in the former. On appellants' view, money is money, whether it be characterized as damages or disgorgement. But while injunctions were the exclusive business of equity, it was never true that money claims were totally excluded from its jurisdiction. Actions against a trustee for breach of trust, *Nedd v. United Mineworkers of America,* 556 F.2d 190, 206–07 (3 Cir. 1977), *petition for cert. pending,* are a classic example of the power of an equity judge to require a defendant to pay money. Indeed, as Professor Moore states, 5 Federal Practice ¶ 38.-19[2] at 169 (1977):

Prior to the adoption of the Rules [of Civil Procedure], and for two decades after their adoption it was generally held that if a claim was properly equitable in character, there was no right to a jury trial on an issue of damages incidental to the equitable relief that the plaintiff sought.

See *Camp v. Boyd,* 229 U.S. 530, 552, 33 S.Ct. 785, 57 L.Ed. 1317 (1913); *Greene v. Louisville & Interurban Railroad Co.,* 244 U.S. 499, 520, 37 S.Ct. 673, 61 L.Ed. 1280 (1917); *Porter v. Warner Holding Co.,* 328 U.S. 395, 399, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946).

■ It is clear, however, that this received learning has been greatly impaired by *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962). Under that decision, the court must analyze the nature of the claim for a money judgment. If that claim "was triable to a jury, it must still be so tried although it was asserted in a suit where the basic relief sought was equitable." Wright, Federal Courts, § 92 at 453 (3d ed. 1976). The name which the complaint affixes to the money claim is not controlling, and if the money claim is triable to a jury it must be tried first.

■ On the other hand, not all money claims are triable to a jury. A historic equitable remedy was the grant of restitution "by which defendant is made to disgorge ill-gotten gains or to restore the status quo, or to accomplish both objectives." See 5 *Moore, supra,* ¶ 38.24[2] at 190.5, and *Porter v. Warner Holding Co., supra,* 328 U.S. at 400–02, 66 S.Ct. 1086. And "[w]hen restitution is sought in the form and in the situations allowed in equity prior to the rules or authorized by valid statutes there is no right to jury trial." 5 *Moore, supra,* ¶ 38.24[2] at 190.6. Disgorgement of profits in an action brought by the SEC to enjoin violations of the securities laws appears to fit this description; the court is not awarding damages to which plaintiff is legally entitled but is exercising the chancellor's discretion to prevent unjust enrichment.

This view is consistent with recent judicial pronouncements. In *Curtis v. Loether, supra,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260, while sustaining the right to a jury trial in an action for damages for discrimination in housing under § 812 of the Civil Rights Act of 1968, 42 U.S.C. § 3612, the Court said it was not predicting that it would reach the same result in discriminatory employment cases under Title VII of the Civil Rights Act of 1964 where courts are authorized, 42 U.S.C. § 2000e–5(g), not only to enjoin but to "order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay," 415 U.S. at 196–97, 94 S.Ct. at 1010. And the Court was at further pains to say:

> Nor is there any sense in which the award here can be viewed as requiring the defendant to disgorge funds wrongfully withheld from the plaintiff.

415 U.S. at 197, 94 S.Ct. at 1010. In *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 416–18, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), the Court characterized the power to order back pay under Title VII as "equitable in nature." See also *Pearson v. Western Electric Co.,* 542 F.2d 1150, 1152 (10 Cir. 1976). Further, lower courts have continued in the wake of *Curtis* to hold that back pay may be awarded without a jury trial in Title VII cases, see, e. g., *EEOC v. Detroit Edison Co.,* 515 F.2d 301, 308 (6 Cir. 1975), *vacated on other grounds,* 431 U.S. 951, 97 S.Ct. 2669, 53 L.Ed.2d 267 (1977); *Slack v. Havens,* 522 F.2d 1091, 1094 (9 Cir. 1975). However, the Court has recently held that Congress intended that there be a right to a jury trial in a private action for lost wages under the Age Discrimination in Employment Act (ADEA). *Lorillard v. Pons,* —— U.S. ——, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978). This decision went largely on the basis that Congress had directed that the ADEA should be enforced in accordance with the "powers, remedies, and procedures" of the Fair Labor Standards Act, where the right to a jury trial in private

actions had long been recognized. Without deciding the jury trial issue with respect to Title VII actions, the Court did distinguish the ADEA from Title VII on the basis that under the latter, but not the former, "the availability of back pay is a matter of equitable discretion." —— U.S. at ——, 98 S.Ct. at 872.

■ While from the standpoint of a defendant in an action for violation of the securities laws there may be no great difference between paying money in response to a private suit for damages and in a SEC action for injunction and disgorgement wherein the SEC makes the proceeds of disgorgement available to injured parties, the suit by the SEC is decidedly more analogous to the traditional jurisdiction of equity to award restitution. Its availability is entrusted to the discretion of the court, a factor that has been considered significant in the resolution of the question whether back pay awards in discrimination cases are equitable or legal in nature. See *Curtis v. Loether, supra,* 415 U.S. at 197, 94 S.Ct. 1005, 1010; *Albemarle Paper Co. v. Moody, supra,* 422 U.S. at 443, 95 S.Ct. 2362 (Rehnquist, J., concurring); *Dunlop v. Darboian Enterprises, Inc.,* 410 F.Supp. 479, 481 (E.D. Mich.1975). We thus agree with what Judge Weinfeld said on this subject in *SEC v. Petrofunds, Inc.,* 420 F.Supp. 958 (S.D.N.Y.1976), interlocutory appeal under 28 U.S.C. § 1292(b) dismissed with prejudice. Accord, *SEC v. Associated Minerals, Inc.,* 75 F.R.D. 724 (E.D.Mich.1977); see also *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1104 (2 Cir. 1972); *SEC v. Golconda Mining Co.,* 327 F.Supp. 257 (S.D.N.Y.1971).

Defendants' second argument for a jury trial is that, under our recent decision in *Shore v. Parklane Hosiery Co.,* 565 F.2d 815 (1977), a case arising under §§ 10(b), 13(a), 14(a), and 20(a) of the Securities Exchange Act, a decree against them in the SEC's action will act as a collateral estoppel on issues of fact and law determined in that action in any subsequent private damage suits that might be brought.[4] The argu-

---

4. It is worth noting that if, as urged by the SEC, see point IV *infra* a finding of *scienter* is

not necessary to warrant issuance of an injunction in a SEC action under Rule 10b–5, a decree

ment proves too much. Collateral estoppel would exist equally if the decree here under review were for an injunction only. But it has never been thought that because an injunction might have that effect, a defendant is entitled to a jury trial of a suit for an injunction. As we noted in *Crane Co. v. American Standard, Inc.,* 490 F.2d 332, 342 (2 Cir. 1973), the holding in *Beacon Theatres v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), the *fons et origo* of modern concern over the interplay between the right to jury trial in suits at common law and the lack of such a right in suits in equity, assumed that there would be no jury trial on the plaintiff's claim for an injunction and a declaratory judgment and that a judgment for the plaintiff on these claims would work as a collateral estoppel on the defendant's counterclaim for damages. As Judge Mansfield said in *Shore, supra,* 565 F.2d at 820:

> Thus *Beacon Theatres* simply asserts that where parties join legal and equitable claims arising out of the same transaction, the court must schedule the sequence of trials to protect a party's constitutional right to a jury trial.

Neither *Beacon Theatres* nor its subsequent extension in *Dairy Queen, Inc. v. Wood, supra,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44, implies that potential collateral estoppel effects in some other actions entitle a party to a jury trial where the claim in suit is outside the protection of the Seventh Amendment. Cf. *Katchen v. Landy,* 382 U.S. 323, 336–40, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966).

II. *Sufficiency of the evidence.*

The only claims of insufficiency of the evidence that merit discussion are those on behalf of Mary Sharpe and Marlene Kleinman.

▮ Sharpe, who was CCS's bookkeeper, opened an account at the firm before the termination of the offering in the name of her mother, Nellie Pyles, and purchased 500 units on January 4, 1972, and 500 more on March 8, 1972, allegedly paying the $2250 price with cash she had kept at home and intending to give her mother any profits. On March 17, 1972, she sold 500 of these units at 2¾, had a check issued in her mother's name, endorsed it, and deposited the funds in her own checking account. She explained her failure to give her mother the small profits on the basis that they had had a dispute, the nature of which she could no longer recall. The judge disbelieved this story and found that Sharpe's alleged purchase for her mother was not *bona fide* and that she "was knowingly attempting to aid and participate in the fraudulent closing of the offering, with some stake in its success . . . ." 410 F.Supp. at 1009.

The court's conclusion was not clearly erroneous. Assuming that Sharpe could lawfully have made a *bona fide* purchase for herself or, as counsel for CCS had advised her, for her mother, the judge was warranted in concluding that she did neither. Rather she used her own funds to add what looked like a public purchase to the list in an amount which was significant to the target quantity for the distribution, and this just at the time when the principal defendants were using dummy nominees for the same purpose.

We have more difficulty with the court's finding that this same evidence supports the conclusion that Sharpe was implicated in the subsequent manipulation. While her position as bookkeeper may have made her aware of what was going on, there is no evidence that she did anything to forward this, except for two small pieces of evidence which we have hit upon in our review of certain charts submitted by the SEC but which were never mentioned by anyone either at the trial or on this appeal. The charts show that on the same day, March 17, 1972, when Mary Sharpe sold 500 shares from the Nellie Pyles account at 2¾, she bought 500 shares for her own account at

---

in such an action would not preclude a defendant in a private damage suit from litigating that issue, at least if *scienter* had not been found.

Compare ALI, Restatement of Judgments 2d, § 68.1(d) (Tent. Draft No. 1, March 1973).

$2\frac{5}{8}$. If these were the same shares, the purported sale and purchase would have been unreal, since there is no evidence that Nellie Pyles knew about her account at that time. Whether or not they were the same, it would be hard to ascribe the decisions to investment judgment. The charts also show that Ms. Sharpe sold 50 units on November 21, 1972 and 150 shares of common stock on February 15, 1973, at prices reflecting the manipulative activity. If the SEC had made some point of these transactions in its direct presentation or in cross-examining Ms. Sharpe, we might have a different case,[5] but we do not think it fair to consider against Ms. Sharpe evidence which she had no opportunity to explain. If we ignore these transactions, all that is left is the sale of 500 shares at a small profit at the very beginning of the period of alleged manipulations. This is not enough. It may well be, as the district court found, that Ms. Sharpe must have known of the fraudulent manipulations of the other defendants, but that would not constitute manipulation on her part. Nor can we discern from this record how Sharpe's transactions "more or less, coincided with the manipulations of Drucker and Kleinman," 410 F.Supp. at 1014, more so than would any transactions in BL securities undertaken during this period. Indeed, as pointed out, the 500 share sale occurred before serious manipulation had begun. We thus think there was insufficient evidence to find that Ms. Sharpe aided and abetted the manipulation. The "unless clearly erroneous" rule, F.R.Civ.P. 52, does not relieve a proponent of the task of supplying evidence sufficient to meet his burden of persuasion. Cf. *Esso Standard Oil Co. v. Sun Oil Co.,* 97 U.S.App. D.C. 154, 229 F.2d 37, *cert. denied,* 351 U.S. 973, 76 S.Ct. 1027, 100 L.Ed. 1491 (1956); *Jones v. Pitt County Board of Education,* 528 F.2d 414, 418–19 (4 Cir. 1975) (Craven, J., dissenting).

■ The evidence with respect to Marlene Kleinman's participation in the manipulation is likewise not too impressive. The chief item is that on October 17, 1972, under an alias she bought 100 units from a broker at 33, only six minutes after CCS had sold them to the same broker at $32\frac{3}{4}$. The SEC argues there was no reason for her to pay an extra $25, plus a commission, for units which she could have bought directly from CCS. She also bought 500 units for 35 on November 20, 1972 and sold them to CCS at $35\frac{7}{16}$ on January 10, 1973. The SEC sought to eke out this rather meagre evidence with Mrs. Kleinman's failure to testify and the adverse inference that could be drawn therefrom, see *N. Sims Organ & Co. v. SEC,* 293 F.2d 78, 80–81 (2 Cir. 1961), *cert. denied,* 368 U.S. 968, 82 S.Ct. 440, 7 L.Ed.2d 396 (1962). The case is also close, particularly in light of the SEC's failure to introduce any oral testimony about Mrs. Kleinman, and we might well have found differently than did the district court, but in this instance we think the evidence was sufficient to sustain the judge's finding of complicity. Whether Mrs. Kleinman should have been subjected to an injunction is another matter, which we will discuss below.

III. *The appropriateness of an injunction.*

Appellants argue that even if they were properly found to have violated the securities laws, it was inappropriate for the court to have issued an injunction. They contend that none of them has any history or pattern of securities violations; that this action was commenced 15 months and the injunction was imposed more than three and a half years after the last violation; that Kleinman and Drucker had not long been in the securities business, had voluntarily terminated all connection with it long before the injunction issued, and by virtue of agreements with the SEC cannot return to it without the consent of the regulatory agencies involved; and that the prospects of future violations by Ms. Sharpe and Mrs. Kleinman are even less. The SEC responds that appellants' violations were repeated

---

**5.** Judge MacMahon began his opinion by complaining, quite justifiably in our view, that "the presentation of the case upon the trial was confused, disjointed, unfocused, incoherent and, at times, incomprehensible." 410 F.Supp. at 1006.

over the course of a year, that Drucker and Kleinman do have a history of securities violations, and that Drucker's and Kleinman's consent to a Commission order to stay out of the securities industry is a much weaker safeguard against a securities violation than an injunction. In addition, the Commission cites a chorus of cases, including many of our own, saying as stated in *SEC v. Manor Nursing Centers, Inc., supra,* 458 .F.2d at 1100, that

> [A] district court has broad discretion to enjoin possible future violations of law where past violations have been shown, and the court's determination that the public interest requires the imposition of a permanent restraint should not be disturbed on appeal unless there has been a clear abuse of discretion.

It is fair to say that the current judicial attitude toward the issuance of injunctions on the basis of past violations at the SEC's request has become more circumspect than in earlier days. Experience has shown that an injunction, while not always a "drastic remedy" as appellants contend, often is much more than the "mild prophylactic" described by the dissenters in this court in *SEC v. Capital Gains Research Bureau, Inc.,* 306 F.2d 606, 613 (2 Cir. 1962), a phrase quoted by the Supreme Court at 375 U.S. 180, 193, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963).[6] In some cases the collateral conse-

quences of an injunction can be very grave, see *SEC v. Geon Industries, Inc.,* 531 F.2d 39, 54–55 (2 Cir. 1976); Note, The Scienter Requirement in SEC Injunctive Enforcement of Section 10(b) after *Ernst & Ernst v. Hochfelder,* 77 Colum.L.Rev. 419, 442–43 & n.127 (1977); Berner & Franklin, Scienter and Securities and Exchange Commission Rule 10b–5 Injunctive Actions: A Reappraisal in Light of *Hochfelder,* 51 N.Y.U.L. Rev. 769, 785–86 (1976); Mathews, SEC Civil Injunctive Actions, 30 Bus. Lawyer 1303, 1307–10 (1975). The Securities Act and the Securities Exchange Act speak, after all, of enjoining "any person [who] is engaged or about to engage in any acts or practices" which constitute or will constitute a violation. Securities Act, § 20(b), Securities Exchange Act, § 21(d).[7] Except for the case where the SEC steps in to prevent an ongoing violation, this language seems to require a finding of "likelihood" or "propensity" to engage in future violations. See *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 394 (2 Cir.) (opinion of Gurfein, J., sustaining denial of injunction), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973). As said by Professor Loss, "[t]he ultimate test is whether the defendant's past conduct indicates . . . that there is *a reasonable likelihood* of further violation in the future." (emphasis supplied). 3 Securities

---

**6.** The description may not have been improper with respect to the very limited injunction sought in *Capital Gains.*

**7.** In contrast the Investment Company of Act § 42(e) and the Investment Advisers Act of 1940 § 209(e) say "has engaged" rather than "is about to engage". As of 1961, the SEC had made four unsuccessful efforts to have the 1933 and 1934 acts amended to correspond with the 1940 acts. On the last of those attempts the Senate committee rejected the amendment as unnecessary in light of existing holdings that a judge should consider past violations as showing "the existence of some cognizable danger of recurrent violation." 3 Loss, Securities Regulation 1976–77 & n.4 (1961). In 1975, there was another unsuccessful effort. The conference report on the Securities Acts Amendments stated:

> Section 21(e) of the Exchange Act authorizes the SEC to seek injunctive relief in the Federal courts in appropriate cases to protect

the public interest from securities laws violations. This section was amended by the Senate bill in several respects, two of which require special mention. Section 21(e) was amended (i) by adding the words "has engaged" to the present statutory language "is engaged or is about to engaged in * * * a violation," and (ii) by changing the present statutory phrase "proper" showing to "*such*" showing. The House amendment contained no similar provision.

> The conference substitute does not make the noted Senate proposed changes in existing law. The Senate language is dropped without prejudice, the conferees believing that existing law does not require clarification in these respects.

H.R.Rep.No.94–229, 94th Cong., 1st Sess. 102 (1975), U.S.Code Cong. & Admin.News 1975, p. 333. See also ALI, Federal Securities Code § 1515(a), Reporter's Revision of Text of Tent. Drafts Nos. 1–3 (Oct. 1, 1974).

Regulation 1976 (1961). Our recent decisions have emphasized, perhaps more than older ones, the need for the SEC to go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence. See *SEC v. Universal Major Industries,* 546 F.2d 1044, 1048 (2 Cir. 1976), *petition for cert. pending; SEC v. Parklane Hosiery,* 558 F.2d 1083 (2 Cir. 1977), and *SEC v. Bausch & Lomb, Inc.,* 565 F.2d 8, 18 (2 Cir. 1977) where the court went so far as to say "[T]he Commission cannot obtain relief without positive proof of a reasonable likelihood that past wrong-doing will recur." Compare *SCM Corp. v. FTC,* 565 F.2d 807, 812 – 13 (1977). See also Comment, Scienter and SEC Injunctive Suits, 90 Harv. L.Rev. 1018, 1026 (1977); Note, SEC Enforcement Actions to Enjoin Violations of Section 10(b) and Rule 10b–5: The Scienter Question, 5 Hofstra L.Rev. 831, 834–36 (1977).

■ Despite this we have no difficulty in sustaining the injunction with respect to the principal defendants here. Judge MacMahon, referring to Judge Tenney's opinion in *SEC v. Universal Major Industries,* CCH Fed.Sec.L.Rep. ¶ 95,229 at 98,214 (S.D.N.Y.1975), later to be affirmed by this court, 546 F.2d 1044, 1048 (1976), cited the following as relevant factors: [8]

the fact that defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an "isolated occurrence;" whether defendant continues to maintain that his past conduct was blameless; and whether, because of his professional occupation,

the defendant might be in a position where future violations could be anticipated.

410 F.Supp. at 1020. He pointed out that the violations committed by Drucker, Kleinman, CCS and DK&B were "repeated and persistent" and that Drucker was still receiving $500 a month from BL, 410 F.Supp. at 1020. We add that, in our view of the evidence, the entire transaction here was essentially fraudulent; as to the principal defendants the improperly closed Regulation A offering was simply the necessary first step in their career of manipulation which sky-rocketed the stock with a book value of about 28¢ per share and no earnings to a peak market price of 24½.[9]

We take a different view of the propriety of an injunction with respect to Ms. Sharpe and Mrs. Kleinman. Since we have held the evidence was insufficient to find that Ms. Sharpe engaged in or aided and abetted the manipulation, there is no basis for enjoining her with respect to conduct of that sort. Even as to the unlawful closing, we see no likelihood of repetition. Her participation in the closing violation was exceedingly limited. The very factors appropriately relied on by the judge in granting an injunction against the principal defendants seem to dictate the opposite in the case of Ms. Sharpe. The same is true with respect to Mrs. Kleinman. Her connection with the manipulation consisted of two transactions, a purchase of 100 units and a purchase and sale of 500 units, producing a profit of $228.75 before commissions and not including any loss on the 100 shares she retained.

---

**8.** It is significant that while this court largely repeated Judge Tenney's list of factors, it substituted "the likelihood of future violations" for "the fact that defendant has been found guilty of illegal conduct."

**9.** In an SEC administrative proceeding, *In the Matter of S.J. Salmon Co., Inc.,* Drucker, Kleinman and CCS were charged with manipulating the price of some or all of 26 different securities, see SEC Ex. Act Release No. 11045 (1974). In response to this and another complaint relating to the conduct here at issue, SEC Ex. Act Release No. 11018 (1974), they consented to an order that revoked the broker-dealer registration of CCS and barred Drucker and Kleinman

from association with any broker-dealer or investment company or investment adviser, subject to a right to apply to the Commission after two years for leave to become associated in a non-supervisory capacity upon a showing that they would be supervised. SEC Ex. Act Release No. 11782 (1975). We also take notice of the entry, by consent, of a preliminary injunction against Drucker in a subsequent action involving BL securities. *SEC v. Drucker,* 76 Civ. 2643 (Order of Preliminary Injunction filed Nov. 29, 1976). While defendant denies he consented to the order, both he and his attorney signed the stipulation providing for its entry.

The trial court's statement with regard to these two defendants, "We see no reason to believe that, should a similar opportunity arise in the future, they would shy away," is hardly a finding of likelihood of recurrence. It would make a mockery of language such as that we have recently used in *Bausch & Lomb* to hold that the SEC had met its burden of showing a likelihood of recurrence with respect to these two minor participants concerning whom there was no evidence of prior or subsequent violations. Contrast *SEC v. Shapiro,* 494 F.2d 1301, 1308 (2 Cir. 1974).[10]

### IV. *The standard of culpability required for injunctive relief.*

Seizing upon language used by the district court in discussing the liability of Sharpe and another defendant, Guttman, who has not appealed, which we quote in the margin,[11] and findings that Sharpe, Guttman and Marlene Kleinman were in a position to know of the fraudulent scheme and in the exercise of reasonable care should have realized that their actions would further it, 410 F.Supp. at 1019, 1020, and that they "negligently, if not knowingly, aided the manipulation," 410 F.Supp. at 1014, appellants urge that the district court applied a negligence rather than a scienter standard to all defendants and that the award of relief was therefore unjustified in light of *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Recognizing that the Supreme Court expressly left open the question whether scienter is a necessary element in an action for injunctive relief under Section 10(b) and Rule 10b–5, they rely on what they urge to be the compelling logic of the remarks made by Mr. Justice Blackmun in dissent, 425 U.S. at 217–18, 96 S.Ct. 1375,

particularly as applied to a case like this where a monetary recovery was a principal objective of the injunction action and has been obtained.

The question whether *Hochfelder* requires us to overrule or qualify our decisions, going back to the well-known *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 854–55, 866–68 (concurring opinion) (2 Cir. 1968), cert. denied sub nom. *Kline v. SEC,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), that a showing of negligence suffices to support an injunction in an action by the SEC is a matter of great importance, on which the final word will not rest with us. See, e. g., Berner & Franklin, *supra,* 51 N.Y.U.L.Rev. 769; Note, *supra,* 77 Colum.L. Rev. 419; Note, Scienter and Injunctive Relief Under Rule 10b–5, 11 Ga.L.Rev. 879 (1977); Comment, *supra,* 90 Harv.L.Rev. 1018; Note, *supra,* 5 Hofstra L.Rev. 831; Note, Scienter's Scope and Application in Rule 10b–5 Actions: An Analysis in Light of *Hochfelder,* 52 Notre Dame Law. 925 (1977). The question received glancing attention in *SEC v. Universal Major Industries Corp., supra,* 546 F.2d at 1046–47, but the indication in that opinion favorable to the SEC is hardly conclusive, both because the injunction there at issue related to aiding and abetting a violation of § 5 of the 1933 Act rather than § 10(b) and Rule 10b–5 under the 1934 Act and because the district court had found that the alleged aider and abetter had acted "with knowledge or reckless disregard to the truth." Accordingly, in *SEC v. Bausch & Lomb, Inc., supra,* 565 F.2d at 14, the court apparently did not consider that *Universal Major Industries* [12] had settled the question, which it found unnecessary to decide in light of its holding that the SEC had not made a sufficient showing of likelihood of recurrence to warrant injunctive relief.

---

**10.** While there is no evidence here, as there was in *Bausch & Lomb,* of these defendants' remorsefulness and concern about their past misconduct, that was simply one factor the court considered there in determining the likelihood of recurrence. The absence of such evidence in this case cannot overcome the Commission's failure otherwise to establish that likelihood with respect to Ms. Sharpe and Mrs. Kleinman.

**11.** "It has been held that a negligence standard applies in measuring the civil liability of an individual charged with having aided and abetted a securities law violation." 410 F.Supp. at 1019.

**12.** The case was not even cited in the *Bausch & Lomb* opinion.

We likewise find it unnecessary to decide the question here. With respect to the appellants other than Ms. Sharpe and Mrs. Kleinman, the evidence showed action of the most deliberate sort—the creation of phony nominee accounts to create a false appearance that 50,000 BL units had been sold and large-scale manipulation of BL securities. There can be no doubt from the trial court's findings that these defendants were aware of the circumstances in which they operated and that they acted purposefully and in bad faith. Their behavior comes precisely within the Court's definition of *scienter* as referring "to a mental state embracing intent to deceive, manipulate, or defraud." 425 U.S. at 194 n.12, 96 S.Ct. at 1381 n.12. See *Arthur Lipper Corp. v. SEC*, 547 F.2d 171, 180–81 (2 Cir. 1976), *cert. denied,* —— U.S. ——, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978); *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 45, (2 Cir. 1977), see generally Haimoff, Holmes Looks at *Hochfelder* and 10b–5, 32 Bus.Law. 147 (1976); Bucklo, The Supreme Court Attempts to Define Scienter Under Rule 10b–5: *Ernst & Ernst v. Hochfelder*, 29 Stan.L. Rev. 213 (1977). Even with respect to Ms. Sharpe and Mrs. Kleinman, unlike *Hochfelder,* this was a case not of misrepresentation of facts of which the defendant was not but allegedly should have been aware; like *Lipper* it was a case of action. Ms. Sharpe and Mrs. Kleinman knew precisely what they were doing and intended to do just what they did. Indeed, the trial court expressly found, "Sharpe was knowingly attempting to aid and participate in the fraudulent closing, with some stake in its success . . . .", 410 F.Supp. at 1009, and that, with respect to the manipulation, "a fair preponderance of the evidence indicates that they must have known of the fraudulent scheme." 410 F.Supp. at 1014.

## V. *Computation of disgorgement.*

Only a few of appellants' points on the computation of disgorgement require comment. Preliminarily, we are satisfied that the SEC's charts, while not free of inaccuracy, were reasonably complete and suitable for the purpose to which they were applied.

■ Defendants complain that the court's computation of profits and losses ended on March 2, 1973, the last trading day before the SEC suspended trading in BL securities; that they still held substantial amounts of such securities at that time; and that losses after trading was resumed wiped out any profits. We see no reason why, in determining how much should be disgorged in a case where defendants have manipulated securities so as to mulct the public, the court must give them credit for the fact that they had not succeeded in unloading all their purchases at the time when the scheme collapsed. Compare ALI Restatement of Trusts 2d § 213 (1959).

■ Defendants also complain that the computation took account not only of transactions with the public but also of transactions among themselves. However, the primary purpose of disgorgement is not to compensate investors. Unlike damages, it is a method of forcing a defendant to give up the amount by which he was unjustly enriched, see pp. 95, 96 *supra.* Disgorgement here was ordered on a several, not a joint basis. It is immaterial that in a particular instance the enrichment came from another party to the scheme rather than from the public.

■ Finally defendants make numerous claims of mathematical error. The SEC concedes there may have been one whereby a sale of 3250 shares by Kleinman may have been charged to Drucker. It suggests that we affirm the disgorgement as to Drucker to the extent of $24,500 that he concedes to be mathematically correct and direct a remand to consider whether any additional amount should be included. We will do this. Our remand will also permit other defendants to present claims of mathematical (but not of theoretical) error. Hopefully the parties can agree upon an appropriate sum without imposing any further burden on the district judge.

■ The judgment is modified to exclude Ms. Sharpe from the finding with respect to manipulation and Ms. Sharpe and

Mrs. Kleinman from the injunction (but not from disgorgement)[13] and is otherwise affirmed except as to the mathematical errors in the computation of disgorgement, as to which the cause is remanded. No costs.

13. Although here disgorgement was sought as ancillary relief in an injunction action, we do not think that when a violation has been established, a failure of the SEC to show the likelihood of recurrence required to justify an injunction should relieve a defendant found to have violated the securities laws from the obligation to disgorge. Also our holding that there was insufficient evidence to find that Ms. Sharpe had engaged in manipulation does not relieve her from liability to disgorge since the fraudulent closing was inextricably linked with the obtaining of the profits ordered to be disgorged.