**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Gary R. PARO, National Mail Order Consultants, Inc., Raymond W. Ackerman, Donald R. Haberle, Richard L. Carter, Defendants.**

No. 79–CV–70.

United States District Court, N. D. New York.

March 29, 1979.

**638**

William D. Moran, Regional Administrator, Securities and Exchange Commission, New York City, for plaintiff; Andrew E. Goldstein, Connie Barclay Smith, Douglas P. Jacobs, Paul Lubetkin, S. Jane Rose, New York City, of counsel.

Charles T. Beeching, Bond, Schoeneck & King, Syracuse, N. Y., for defendants Gary R. Paro and National Mail Order Consultants, Inc.

Samuel Carroll, Central Square, N. Y., for defendants Raymond W. Ackerman and Donald R. Haberle.

John M. Lischak, Syracuse, N. Y., for defendant Richard L. Carter.

MUNSON, District Judge.

### Memorandum-Decision and Order

The Securities and Exchange Commission has commenced this action pursuant to Section 20(b) of the Securities Act of 1933, 15 U.S.C. § 77t(b), and Section 21(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(d). The complaint alleges that the defendants have violated the registration and antifraud provisions of both Acts, as well as Rule 10b–5. 15 U.S.C. §§ 77e(a), 77e(c), 77q(a), 78j(b), 17 C.F.R. § 240.20b–5. To remedy these violations the Commission seeks a permanent injunction barring the defendants from continuing to offer and sell unregistered securities, precluding them from engaging in fraudulent practices in connection therewith, and disgorgement of monies already obtained through such practices. In the interim, the Commission has applied for preliminary injunctive relief pursuant to F.R.Civ.P. 65. Paro and National Mail Order Consultants, Inc. have consented to such an order, and following a one-day hearing conducted to receive evidence in support of the Commission's application for a preliminary injunction, the Court has found that the S.E.C. will probably be successful in ultimately proving that the remaining defendants have violated the registration and antifraud provisions of the Securities Acts. The Court has also found that future violations are likely to recur if preliminary injunctive relief is denied. The defendants Ackerman, Carter and Haberle shall therefore be preliminarily enjoined from further violations of the Securities Acts and from taking any action which would preclude an effective final order of this Court.[1]

As in most securities actions, a clear understanding of the underlying scheme is necessary for effective resolution of the legal issues presented. This degree of clarity is particularly important where, as here, the Court is called upon to consider the totality of the circumstances in determining whether the defendants' offering constitutes an "investment contract" within the meaning of the Securities Acts. For this reason, I have summarized my findings of fact in the following narrative which will hopefully

---

1. The Court heard argument concerning the SEC's application for a Temporary Restraining Order on February 2, 1979. At this time, the defendants Ackerman and Haberle were represented by Samuel Carroll, Esq. However, neither of these defendants appeared individually or through counsel when the Commission's application for a preliminary injunction was heard.

dispel some of the confusion surrounding the legal issues in this case.

## FINDINGS OF FACT

Gary Paro is one of the primary defendants in this action. He is the President and majority shareholder of National Mail Order Consultants, Inc. He also engages in mail order, advertising, and distribution ventures through vehicles known as The Copy Shop, Arrow Advertising and Publications, T.A.S. Investments, Paro Publications, and Sheperd Publications. National Mail Order Consultants, Inc. is the second principle defendant. It is the corporate vehicle through which "Dollar Power" and an investment scheme known as "co-op advertising" is offered. NMOC also employs the remaining defendants, with the exception of Richard Carter, who severed his ties with the organization during February of 1978.[2]

*The Underlying Scheme:*

During 1975, Paro organized a mail order promotions company known as T.A.S. Investments. He thereafter published newsletters and flyers announcing the "great success" of the T.A.S. "advertising professionals". As proof of its "brilliant" advertising expertise, T.A.S. Investments claimed profits exceeding 500% of the cost of the advertising space. The flyers then offered investors an opportunity to participate in a unique profit sharing plan in which T.A.S. would guarantee profits ranging from 50% within the space of thirty-six days to 100% within the space of ninety days, depending upon the size of the investment. The T.A.S. offer was not, however, registered with the Securities and Exchange Commission, nor was it registered with the securities boards of the numerous states into which the T.A.S. investment brochures had been mailed. As a result, by May of 1978, injunctions or cease and desist orders had been entered against Paro and T.A.S. In-

vestments in Arkansas, Michigan, Minnesota, New York, and Texas. In addition, the Securities and Exchange Commission had commenced an action against Paro and T.A.S. Investments in the Northern District of New York. This action culminated in a consent decree issued on July 20, 1977, barring Paro, T.A.S., and its affiliates or entities under their control from engaging in further violations of the registration and antifraud provisions of the Securities Acts. *S.E.C.v. T.A.S. Investments,* 77–CV–275.

Following entry of the consent decree, T.A.S. Investments was consolidated under National Mail Order Consultants, Inc. This organization was established to begin promoting Paro's next venture: *The Reporter.* Indeed, shortly after the restitution notices were mailed, Paro wrote to his followers, informing them of his latest undertaking with the following exhortations:

> This little beauty [The Reporter] will bring profits larger than we ever forecasted *in any of our past programs* to individuals that have the foresight to become one of our advertisers in the pages of *The Reporter.* [emphasis in original]

However, after meeting and discussing their common business aspirations, Paro and his newly hired assistant, Carter, renamed *The Reporter* "Dollar Power" and began a vigorous interstate mailing campaign designed to solicit investments in a scheme vicariously labelled "co-op advertising".

The brochures published by the defendants are probably one of the best places to begin examining the economic realities of "co-op advertising". These brochures explained that investors could participate in the profits of NMOC's mail order business by simply mailing in their investment and waiting thirty days. The size of their investment was not measured by shares of stock. Rather, it was keyed to the size of

---

**2.** Ackerman has been employed by NMOC as an Executive Officer and Advertising Sales Representative since March of 1978. Haberle has been employed by NMOC as the Director of Advertising for an NMOC publication known as *Dollar Power* since November of 1977. Car-

ter served as a Marketing Consultant and Advertising Sales Representative from August of 1977 through February of 1978. All of the defendants presently reside in the upstate New York area.

the advertisement that the investor wished to sponsor, the number of copies of *Dollar Power* in which it was to appear, and the duration of its appearance. The investors did not select the products to be sold, they did not write the advertisements, they did not approve an advertising copy prior to publication, and they exercised no control over the content or layout of the advertisements. These details were all entrusted to the defendants' self-proclaimed brilliance and ingenuity in the mail order business.[3] Investors were merely encouraged to "trust Dollar Power" whose promoters and principals would "find you a product and write you an ad that will make a mail order fortune".[4] The investor was merely required to select the number of *Dollar Power* issues in which he desired an advertisement to appear, the total circulation he desired to attain, and the size of the advertisement which would be run. The promoters would then advise him of the product which they had selected and he would do nothing further until the defendants mailed him his monthly profits. As the defendants' brochures explained:

> All orders that are received from your co-op advertisement will be professionally processed by us, and mailed from our Syracuse offices directly to your customers. You never handle any merchandise, fold flyers, or stuff endless envelopes. From each order we will deduct approximately 50% for the cost of the publication and shipping and handling. The remaining 50% will be credited to your account each day. After publication, once each month we will mail you your share of the total sales generated along with a statement of your account which will be maintained on an IBM computer. Should any refunds be requested, they will be handled by *DOLLAR POWER!* and deducted from our share of the sales. *DOLLAR POWER!* Financial Publications will handle all replacement shipments, inquiries and refunds at no cost or obligation to our co-op advertiser!

The affidavits, depositions, and hearing testimony also reveal that similar claims were made regarding "co-op advertising" throughout the defendants' extensive interstate telephone solicitation program. During these conversations, investors were repeatedly told that *Dollar Power* and the "co-op advertising program" were doing "tremendously well" under Paro's astute leadership and that "co-op advertising" was a risk free investment. Investors were also assured that they would receive a prompt return on their investment or a full refund if their "co-op advertisement" did not yield a profit. However, the affidavits and testimony supplied by the Commission demonstrate that this "guarantee" was frequently, if not always, dishonored.[5] Furthermore, the credible evidence clearly demonstrates that *Dollar Power* did not have the circulation which the defendants claimed it

---

3. The products selected by the defendants for mail order advertising bespeak their good taste and expertise in marketing. These products included the following world renowned literary classics: *Witchcraft & Magic, A Clutch Of Vampire, The Making of A Free High School: No Particular Place To Go, World of The Makers, Treasure Under Your Feet.*

4. The defendants' sales campaign is perhaps best illustrated by the following excerpt from the defendants' brochures:
ANYONE CAN ADVERTISE IN DOLLAR POWER! YOU DON'T NEED A PRODUCT TO ADVERTISE IN DOLLAR POWER! WE SELECT A PRODUCT OR PUBLICATION FROM THE HUNDREDS WE HAVE IN INVENTORY! YOU DON'T EVEN HAVE TO WRITE AN ADVERTISEMENT . . . WE WRITE THE AD FOR YOU! ALL YOU

NEED TO ADVERTISE IN DOLLAR POWER IS FAITH!

5. Evidence submitted by the Commission also suggests that "profits" which may have been paid to initial investors were financed with funds provided by subsequent investors. For example,
Paro kept all of the money from co-op investments, sale of printings, mail order courses, and novelty items in a single bank account. Payments to be made to "co-op advertisers" did not correspond to the sales of products from advertising; and
It was not possible for a "co-op advertisement" to generate a return on the investment within the thirty-day period during which profit checks had been guaranteed.

had,[6] that no financial information concerning Paro or National Mail Order Consultants, Inc. was provided to investors, that investors were never informed of the risks inherent in "co-op advertising" or the fact that this Court, as well as several states, had issued injunctions or cease and desist orders against Paro's securities schemes.

Lastly, it is important to note that, based upon the evidence presently before this Court, there can be little doubt that the Commission will probably be successful in ultimately demonstrating that each of the defendants were well aware of the truth at the time that the preceding nondisclosures and misrepresentations were made. Moreover, there can be little doubt that each of them fully appreciated that investors would have been less likely to risk their earnings in "co-op advertising" if they had known the entire tale behind Paro's entrepreneurial endeavors, and the truth behind each of the facts which had been omitted or misrepresented.

*Present Status:*

By August of 1978, investor pressure for refunds had increased to the point that the defendants were forced to rescind the money-back guarantee which had been an integral part of their earlier promotional campaigns. Nevertheless, they continued to offer interests in a non-guaranteed "co-op advertising" program which was nearly identical to the earlier investment scheme. In fact, beyond the absence of a guarantee, the only significant difference was the concept that an investor's name would appear in the advertisement which the defendants had assigned to him, and the requirement that the investor thereafter forward each order which he received to NMOC together with 50% of the purchase price. Yet despite these minor changes, responsibility for selecting the products still rested in the sole and exclusive discretion of the defendants, as did the responsibility for preparing the advertisements, maintaining the sales or-

ganization, shipping the merchandise, and handling the complaints. Consequently, there can be little doubt that these subsequent efforts to conceal the true character of this scheme have failed.

Inasmuch as the preceding findings were well documented by the investor affidavits and exhibits submitted in support of the Commission's application for a temporary restraining order, the defendants' "co-op advertising" program was suspended by this Court through a temporary restraining order issued on February 6, 1979. Eight days later the Court held a hearing to take testimony in support of the Government's application for a preliminary injunction. Paro and NMOC appeared through counsel and consented to a preliminary injunction barring future unregistered or fraudulent and misleading offerings of "co-op advertising". This preliminary order also precludes these defendants from taking any action which would make a final order ineffectual.

On the day designated for the Rule 65 hearing, neither Ackerman nor Haberle made an appearance. Carter did, however, appear through counsel and, in view of the preliminary consent agreement proposed by Paro and NMOC, the Commission agreed that the testimony thereafter presented would be offered only against Carter and the defaulting defendants. Accordingly, these findings of fact and the conclusions of law which follow apply only to Ackerman, Carter, and Haberle.

## CONCLUSIONS OF LAW

*The Applicable Standard For Granting Preliminary Injunctive Relief:*

▇ The Commission's application for preliminary injunctive relief is governed primarily by 15 U.S.C. § 78u(d):

### Injunction proceedings

(d) Whenever it shall appear to the Commission that any person is engaged

---

6. The evidence has shown that the defendants published only 100,000–200,000 copies of Dollar Power per issue and that the "circulation" estimate set forth in their brochures was based upon the assumption that each copy of "Dollar Power" would be read by eight or nine individuals.

or is about to engage in acts or practices constituting a violation of any provision of this chapter, the rules or regulations thereunder, the rules of a national securities exchange or registered securities association of which such person is a member or a person associated with a member, the rules of a registered clearing agency in which such person is a participant, or the rules of the Municipal Securities Rulemaking Board, it may in its discretion bring an action in the proper district court of the United States, the United States District Court for the District of Columbia, or the United States courts of any territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices, and *upon a proper showing* a permanent or temporary injunction or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available concerning such acts or practices as may constitute a violation of any provision of this chapter or the rules or regulations thereunder to the Attorney General, who may, in his discretion, institute the necessary criminal proceedings under this chapter.

The Second Circuit has unequivocally held that the test announced in *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 250 (2d Cir. 1973) is inapplicable in S.E.C. injunction proceedings. As the Court explained in *S. E. C. v. Management Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975):

> The appellants' crucial error on this score is their assumption that SEC enforcement actions seeking injunctions are governed by criteria identical to those which apply in private injunction suits. Unlike private actions, which are rooted wholly in the equity jurisdiction of the federal court, SEC suits for injunctions are "creatures of statute." "[P]roof of irreparable injury or the inadequacy of other remedies as in the usual suit for injunction" is not required. III L. Loss, Securities Reg-

ulation 1979 (1961, Supp.1969). *See* 7 Moore's Federal Practice ¶ 64.04[1], at 65–40 to –41 (2d ed. 1974). We noted in *SEC v. Torr*, 87 F.2d 449, 450 (2d Cir. 1937);

> As the issuance of an injunction in cases of this nature has statutory sanction, it is of no moment that the plaintiff has failed to show threatened irreparable injury or the like, for it would be enough if the statutory conditions for injunctive relief were made to appear.

This principal has been applied in granting both permanent injunctions and preliminary injunctions, and we perceive no reason why it should not be applicable here. [Footnotes Omitted]

As a result, the District Court must determine whether the S.E.C. has made a "proper showing;" that is, whether the Commission has met its burden of demonstrating (a) probable success upon the merits, and (b) a likelihood of continued violations. *Glen-Arden Commodities, Inc. v. Constantino*, 493 F.2d 1027, 1035–1036 (2d Cir. 1974); *S. E. C. v. Boren*, 283 F.2d 312, 313 (2d Cir. 1960); *S. E. C. v. Brigadoon Scotch Distributors, Ltd.*, 388 F.Supp. 1288, 1290 (S.D.N.Y.1975).[7]

Section 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), defines a "security" as:

> any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.[8]

---

7. This Court has jurisdiction over this action under Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a) and Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa.

8. The definition of a "security" in section 3(a)(10) of the Securities Exchange Act, 15 U.S.C. § 78c(a)(10), is virtually identical, and for the purposes of this case, the coverage of

In this case, the S.E.C. has attempted to establish that "co-op advertising" is an "investment contract" within the meaning of the Acts. The term "investment contract" is, however, undefined by the Securities Act or the applicable legislative reports, *S. E. C. v. W. J. Howey*, 328 U.S. 293, 298, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), as Congress did not attempt to articulate the relevant economic criteria for distinguishing securities from other commercial interests. *United Housing Foundation Inc. v. Forman*, 421 U.S. 837, 847, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). Nevertheless, certain well established standards have been developed by the Courts and there can be little doubt that, when measured against them, "co-op advertising" constitutes an "investment contract" within the meaning of the Securities Acts.

■■■ The Courts ordinarily employ a three part test in determining whether an offering constitutes an "investment contract". The test is whether the scheme involves: (a) an investment of money; (b) in a common enterprise; (c) with profits to come solely from the efforts of others. *SEC v. W. J. Howey Co.*, 328 U.S. 293, 301, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). This test is to be applied in light of the economic realities of the transactions rather than the labels which have been employed to describe them, *United Housing Corp. v. Forman*, 421 U.S. at 851–852, 95 S.Ct. 2051, *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), and while its application must reflect the remedial purposes sought to be attained by the Acts, *Tcherepnin v. Knight, supra* at 336, 88 S.Ct. 548; the term "investment contract" does not embrace every commercial transaction in which innocent parties have fallen victim to fraud or misrepresentation. *International Brotherhood of Teamsters v. Daniel*, —— U.S. ——, ——, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979).

■■■ Whether an offering constitutes an investment contract requires considera-tion of the character that the investment is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect. *SEC v. Joiner Leasing Corp.*, 320 U.S. 344, 352–353, 64 S.Ct. 120, 88 L.Ed. 88 (1943). It is also commonplace to give some deference to the SEC's administrative interpretation, assuming of course, that this interpretation does not offend the clear meaning of the statute as revealed by its language, purpose, and history. *International Brotherhood of Teamsters v. Daniel*, —— U.S. ——, ——, 99 S.Ct. 790, 800, n.20, 58 L.Ed.2d 808, ——. Nevertheless, the touchstone of the economic realities analysis is the "presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *United Housing Corp. v. Forman*, 421 U.S. at 852, 95 S.Ct. at 2060. And in cases where the interest acquired has intermingled security and nonsecurity aspects, the Court must focus on the most significant parts of the plan to determine whether "the interest [to be] obtained [has] to a very substantial degree elements of investment contracts . . ." *International Brotherhood of Teamsters v. Daniel*, —— U.S. ——, ——, 99 S.Ct. 790, 796, 58 L.Ed.2d 808, 816.

■■■ Measured by these criteria, "co-op advertising" is undoubtedly an investment contract within the meaning of the Securities Acts. To begin with, while the defendants might argue that they were merely selling a service, i. e., advertising, this characterization ignores the fact that investors had nothing to advertise. That is, the investors had no products of their own to sell and they were encouraged to rely exclusively upon the defendants' self-professed expertise in selecting a product which would make them a "mail order fortune". Similarly, the investors exercised no control over the make-up or layout of the

the two Acts may be regarded as the same. *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 847 n.12, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975); *Tcherepnin v. Knight*, 389 U.S. 332, 342, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967).

"co-op advertisement" which had been assigned to them. These details were left to the good faith and expertise of the defendants. Investors also relied upon the promoters to provide the products, handling, and refund mechanisms through which the sales would ultimately be consummated. In short, the defendant provided the organization through which investments were capitalized, and investors relied exclusively upon the defendants' managerial and entrepreneurial skills to realize a return on their investment. It is therefore clear that "co-op advertising" did not offer investors an opportunity to expand their own business ventures, rather, it offered them an opportunity to share in profits realized by National Mail Order Consultants, Inc. through the efforts of Paro, Ackerman, Haberle and Carter.

Examined in light of its economic realities, the "co-op advertising" scheme guaranteed services and promised results in the same manner as the sale of whiskey warehouse receipts characterized by the Court as investment contracts in *Glen-Arden Commodities, Inc. v. Constantino*, 493 F.2d 1027 (2d Cir. 1974). There, as here, the promoter's economic inducements were in the nature of an offer to invest, and the evidence had shown that investors tendered their payments not so much to secure the product or services offered, as to participate in an enterprise which was virtually guaranteed to make them a fortune. The fact that investors here selected the size of the advertisement and the number of issues in which it was to appear does not effect the outcome as these details were relatively insignificant, except to the extent that they

determined the size of the investment. Likewise, retraction of the guarantee and inclusion of the requirement that investors forward orders which they had received in response to "co-op advertisements" which had been assigned to them did not affect the basic economic realities of the "co-op advertising" program. Investors still relied upon the defendants' managerial and entrepreneurial skills in composing and laying out the advertisements. As in *Glen-Arden*, they still relied upon the promoters' good taste, marketing skills, and business judgment in selecting the products; and they still relied upon them to maintain a viable business organization through which the products could ultimately be packaged, shipped, and returned in the event of a customer complaint. The fact that the investor's name appeared in the advertisement which had been assigned to him is therefore relatively immaterial as each investor still relied upon the defendants' skill, judgment, and managerial efforts to realize a profit on his investment.[9]

These factors suffice to bring "co-op advertising" within that long line of cases in which purported sales of personalty, service contracts, or both were held to be "investment contracts." *SEC v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946); *SEC v. Commodity Option International, Inc.*, 553 F.2d 628 (9th Cir. 1977); *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir. 1974); *Miller v. Central Chinchilla Group, Inc.*, 494 F.2d 414 (8th Cir. 1974); *SEC v. Glen-Arden Commodities, Inc.*, 493 F.2d 1027 (2d Cir. 1974); *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir.) *cert. den.* 414 U.S. 821, 94

---

**9.** The defendants might, of course, urge that the new brand of "co-op advertising" does not constitute an investment contract insofar as profits are not derived "solely" from the efforts of the promoters. However, if the *Howey* test were applied so literally, promoters could easily avoid compliance with the Securities Acts merely by including some insignificant investor participation requirement. The Courts have therefore held that where, as here, the essential managerial efforts which determine the success or failure of the enterprise are supplied by the promoters, the offering shall be regarded as an "investment contract" even though investors are required to assume nominal duties having little direct effect upon the outcome of the venture. *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir.) cert. den. 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973); *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir. 1974); see also, *1050 Tenants Corp. v. Jakobson*, 503 F.2d 1375, 1378 n.5 (2d Cir. 1974) (while not condemning the *Turner* approach, the United States Supreme Court expressly declined to consider this holding in *United Housing Foundation, Inc. v. Forman*, 421 U.S. at 852 n. 16, 95 S.Ct. 2051).

S.Ct. 117, 38 L.Ed.2d 53 (1973); *Continental Marketing Corp. v. SEC*, 387 F.2d 466 (10th Cir.) *cert. den.* 391 U.S. 905, 88 S.Ct. 1655, 20 L.Ed.2d 419 (1968); *Blackwell v. Bentsen*, 203 F.2d 690 (5th Cir.) *cert. dism'd.* 347 U.S. 925, 74 S.Ct. 240, 98 L.Ed. 406 (1954); *SEC v. Galaxy Foods, Inc.*, 417 F.Supp. 1225, *aff'd* 556 F.2d 559 (2d Cir. 1977); *SEC v. Brigadoon Scotch Distributors, Ltd.*, 388 F.Supp. 1288 (S.D.N.Y.1975); *SEC v. Lake Havasu Estates*, 340 F.Supp. 1318 (D.Minn. 1972); *SEC v. Payne*, 35 F.Supp. 873 (S.D. N.Y.1940). This long term judicial construction of the Securities Acts is unlikely to be disturbed by the Courts in the foreseeable future, *Glen-Arden Commodities, Inc.*, 493 F.2d at 1035, and its application to the facts of this case is entirely consistent with the legislative history of these provisions.[10] The Court therefore holds that the Commission has met its initial burden of showing

that "co-op advertising" is an investment contract within the meaning of the Securities Acts.

*Violation of the Registration and Antifraud Provisions:*

Credible and uncontested evidence introduced by the Commission reveals that no registration statement was in effect at the time that the defendants offered these securities through the mails and facilities of interstate commerce. For this reason, the Government has shown its likelihood of successfully demonstrating the defendants' violation of the registration requirements, *SEC v. International Scanning Devices, Inc.*, 415 F.Supp. 3 (W.D.N.Y.1977), and it remains to be determined whether it has made a "proper showing" with respect to those allegations of the complaint directed to violations of the antifraud provisions.[11]

---

**10.** The broad purpose of the Securities Act is reflected by the Report of the Senate Committee on Banking and Currency, S.Rep. No. 47, 73rd Cong., 1st Sess. 1 (1933):

The aim is to prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation; to place adequate and true information before the investor; to protect honest enterprise, seeking capital by honest presentation, against the competition afforded by *dishonest securities offered to the public* through crooked promotion; . . .

**11.** The second cause of action in the Commission's complaint asserts that the defendants have violated § 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10b of the Securities Exchange Act, 15 *U.S.C.* § 78j(b), and Rule 10b–5 promulgated thereunder. 17 C.F.R. § 240.10b–5. In pertinent part these provisions provide:

§ 77q. Fraudulent interstate transactions

(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or

would operate as a fraud or deceit upon the purchaser.

§ 78j. Manipulative and deceptive devices

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(a) To effect a short sale, or to use or employ any stop-loss order in connection with the purchase or sale, of any security *registered on a national securities exchange*, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

(b) To use or employ, in connection with *the purchase or sale of any security* registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

§ 240.10b–5 Employment of manipulative and deceptive devices.

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances

The antifraud provisions of the Securities Acts generally prohibit the direct or indirect use of any deceptive practice in connection with the purchase or sale of securities. 15 U.S.C. §§ 77q(a), 78j(b). As an exercise of its Congressionally mandated rule-making authority, the Commission has also promulgated Rule 10b–5 which, in essence, prohibits all persons engaged in the offering of securities from (1) employing any device, scheme or artifice to defraud, (2) making any untrue statements with regard to a material fact, or omitting to state any material fact if the statements made, in light of the circumstances, are misleading, or (3) engaging in any act, practice, or course of business which would operate as a fraud or deceit upon any person. *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).

 In view of their remedial purposes, these Congressional and administrative proscriptions have been liberally construed to substitute a philosophy of full disclosure for the doctrine of *caveat emptor* and thus achieve a high standard of business ethics in the securities industry. *SEC v. Capital Gains Research Bureau,* 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963); *Kennecott Copper Corp. v. Curtis Wright Corp.,* 584 F.2d 1195, 1199 (2d Cir. 1978). As a result, facts will be regarded as "material" whenever there is a substantial likelihood that disclosure of the omitted fact would have assumed significance in the deliberations of a reasonable investor; or, stated alternatively, a fact is deemed "material" if its disclosure would have been viewed by a reasonable investor as having significantly altered the "total mix" of information made available. *TSC Industries, Inc. v. Northway Inc.,* 426 U.S. 438, 449, 96

S.Ct. 2126, 48 L.Ed.2d 757 (1976).[12] Thus, to establish the materiality of a misstatement or omission, it must be shown that in all probability the omitted or misrepresented facts would, in view of the circumstances, have assumed actual significance in the deliberations of the reasonable shareholder.

The preceding cases reveal that in each instance of an alleged violation of the antifraud provisions, materiality will depend upon an assessment of the economic significance of the omitted or misrepresented facts. Here, the credible evidence discloses that the defendants failed to inform investors that NMOC published only 100,000–200,000 copies of *Dollar Power* per issue and that the "circulation" estimate touted in NMOC brochures was predicated upon the assumption that each copy of *Dollar Power* would be read by eight or nine individuals. The significance of these misrepresentations is obvious, as a reasonable investor would have been far less enthusiastic about the prospects of the defendants' venture if he had realized that *Dollar Power* actually had only one-fifth of its advertised circulation. Similarly, investors would have been especially dubious of the "co-op advertising" venture if they had been apprised of the cease and desist orders and injunctions which had been issued against Paro and NMOC's predecessor by the state and federal courts. The materiality of these omissions is therefore manifest, as is the materiality of the defendants' failure to disclose that the money-back guarantee was rarely, if ever, honored. Lastly, in light of the fact that "co-op advertising" may well have been an investment transfer scheme (see, e. g., *Cunningham v. Brown,* 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924); *United States v. Cook,* 573 F.2d 281 (5th Cir. 1978)), failure to disclose the risks involved or the

under which they were made, not misleading, or

 (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

12. *While TSC Industries, Inc. v. Northway, Inc., supra,* arose under Rule 14a–9, the same standard of materiality has been applied to

disputes arising under Rule 10b–5. See *Harkavy v. Apparel Industries, Inc.,* 571 F.2d 737, 741 (2d Cir. 1978); *Goldberg v. Meridor,* 567 F.2d 209, 218–219 (2d Cir. 1977); *SEC v. Bausch & Lomb, Inc.,* 565 F.2d 8, 14–15 (2d Cir. 1977); see also *TSC Industries,* 426 U.S. at 445 n.8, 96 S.Ct. 2126; *A.T. Erod v. Perlow,* 375 F.2d 393, 397 (2d Cir. 1967); *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1095 (2d Cir. 1972).

nature and extent of NMOC's financing can be regarded as nothing less than gross concealment of the fundamental criteria necessary to an informed investment decision. The Court therefore holds that the Commission has shown its likelihood of successfully demonstrating that the defendants omitted and misrepresented material facts to secure investments in a security known as "co-op advertising".

The second essential element of an antifraud violation is *mens rea*. However, since the Supreme Court's decision in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), there has been considerable debate concerning the nature and extent of the *mens rea* requirement.

*Hochfelder* considered whether an accounting firm could be held liable in a private damage action under § 10(b) of the 1934 Act on the basis of its negligence in failing to conduct proper audits of a firm alleged to have defrauded the plaintiffs. The Supreme Court held that a private cause of action would not arise under Section 10(b) or Rule 10b–5 absent an allegation of scienter—that is, intent to deceive, manipulate, or defraud. The Court was primarily concerned with rejecting Hochfelder's contention that negligent omissions would, standing alone, suffice to establish a civil claim under Rule 10b–5; and a fair reading of the Court's opinion would indicate that the term "scienter" was used merely to distinguish negligence and not to establish a standard of specific intent to defraud. *United States v. Chiarella*, 588 F.2d 1358, 1370 (2d Cir. 1978).

In *Hochfelder,* the justices made it clear that a major purpose of their decision was to foreclose liability for wholly faultless conduct which resulted in harm to investors. 425 U.S. at 198, 96 S.Ct. 1375. Nevertheless, in a footnote to its holding, the majority stated:

In this opinion the term "scienter" refers to a mental state embracing intent to deceive, manipulate, or defraud. In certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act. We need not address here the question whether, in some circumstances, reckless behavior is sufficient for civil liability under § 10b and Rule 10b–5.

*Id.* at 194, 96 S.Ct. at 1381. While the meaning of this parenthetical observation has provided fertile ground for scholarly speculation,[13] it has served as a veritable quagmire for the courts. Consequently, since *Hochfelder* was decided, the Court of Appeals in this Circuit has repeatedly expressed some uncertainty concerning earlier precedent which had delineated the *mens rea* requirements in various 10b–5 actions. See, e. g., *SEC v. Universal Major Industries Corp.*, 546 F.2d 1044, 1046–1047 (2d Cir. 1976); *SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8, 14 (2d Cir. 1977); *SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 101 (2d Cir. 1977); but see, *Rolf v. Blyth, Eastman Dillion & Co., Inc.*, 570 F.2d 38, 44–47 (2d Cir. 1978). This uncertainty is particularly acute in SEC actions, as the Supreme Court has expressly declined to consider whether scienter is a necessary element in an action for injunctive relief under Rule 10b–5.[14]

An SEC enforcement action is essentially equitable and prophylactic in na-

**13.** Bucklo, The Supreme Court Attempts to Define Scienter Under Rule 10b–5, 29 Stanford L.R. 213, 216–217 (1977); Note, SEC Injunctive Suits, 90 Harv.L.Rev. 831 (1977); Note, The Scienter Requirement in SEC Injunctive Enforcement of Section 10b after *Ernst & Ernst v. Hochfelder,* 77 Colum.L.Rev. 419 (1977); Note, Scienter's Scope and Application in Rule 10b–5 Actions: An Analysis In Light of Hochfelder, 52 Notre Dame Law. 925 (1977); Berner & Franklin, Scienter and Securities and Exchange Commission Rule 10b–5 Injunctive Actions, 51 N.Y.U.L.Rev. (1976).

**14.** The concluding paragraph of note 12 in the *Hochfelder* opinion states:

Since this case concerns an action for damages we also need not consider the question whether scienter is a necessary element in an action for injunctive relief under § 10b and Rule 10b–5. Cf. *SEC v. Capital Gains Research Bureau,* 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1964).

425 U.S. at 194, 96 S.Ct. at 1381.

ture; its primary purpose is to protect the public against harm, not to punish the offender. *SEC v. Capital Gains Research Bureau,* 375 U.S. 180, 193, 200, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). For this reason, the Second Circuit Court of Appeals had, prior to *Hochfelder,* consistently held that a showing of negligence would suffice to support an SEC injunctive action commenced to suspend violations of Section 10(b). See, e. g., *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 854–855 (2d Cir.) (en banc), *cert. denied sub nom. Coates v. SEC,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); *Hanley v. SEC,* 415 F.2d 589, 597 (2d Cir. 1969); *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1096 (2d Cir. 1972). Unfortunately, the Supreme Court in *Hochfelder* declined to consider whether scienter was a necessary element in an action for injunctive relief under Section 10(b) or Rule 10b–5. 425 U.S. at 194 n.12, 96 S.Ct. 1375. The continued integrity of these earlier rulings has therefore been called into question, and while the issue received passing attention in *SEC v. Universal Major Industries Corp.,* 546 F.2d 1044, 1046–1047 (2d Cir. 1976); *SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90, 101 (2d Cir. 1978); and, *SEC v. Bausch & Lomb, Inc.,* 565 F.2d 8, 14 (2d Cir. 1977), the Second Circuit has recently resolved any remaining doubt by specifically holding that the scienter requirement announced in *Hochfelder* is inapplicable in government enforcement actions brought under Sections 10(b) and 21(d) of the 1934 Act. *SEC v. Aaron,* No. 77–6091, slip op. (2d Cir. March 12, 1979).

 Because *Hochfelder* arose under Section 10(b) of the 1934 Act and the final word in the continuing debate over the scienter requirement will rest with the Supreme Court, *SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d at 101, the

Securities and Exchange Commission has begun to litigate the question whether injunctive relief may be awarded upon a showing of negligence resulting in a violation of the antifraud provisions of the 1933 Act. 15 U.S.C. § 77q(a). As one might expect, the answers given have been something less than unanimous. Compare, *SEC v. Geotek,* 426 F.Supp. 715, 726 (N.D.Cal. 1976); *SEC v. Shiell,* Fed.L.Sec.Rep. (CCH) ¶ 96,190 (N.D.Fla.1977); *SEC v. Southwest Coal & Energy Co.,* 439 F.Supp. 820, 826 (W.D.La.1977); *SEC v. World Radio Mission,* 544 F.2d 535, 541 n.10 (1st Cir. 1976); *SEC v. American Realty Trust Co.,* 429 F.Supp. 1148, 1171 (E.D.Va.1977); *SEC v. Cenco Inc.,* 436 F.Supp. 193, 199–200 (N.D. Ill.1977). See also, *Collins Securities Corp. v. SEC,* 183 U.S.App.D.C. 301, 562 F.2d 820 (1977); *SEC v. Penn Central Co.,* 450 F.Supp. 908, 918 (E.D.Pa.1978) (not reaching the issue). Nonetheless, the Second Circuit Court of Appeals has concluded that neither the remedial structure of the Securities Act nor its legislative history suggest that a scienter requirement should be imposed in SEC actions commenced to enjoin violations of Section 17(a). 15 U.S.C. § 77q(a); *SEC v. Coven,* 581 F.2d 1020, 1026–1028 (2d Cir. 1978). The Court has therefore held that those responsible as principals for violations of Section 17(a) may be liable for negligent misconduct in the context of SEC enforcement actions. *SEC v. Coven,* 581 F.2d at 1028.[15]

 The evidence adduced in. this case persuasively demonstrates that Ackerman, Haberle, and Carter have employed the mails and other means and instrumentalities of interstate commerce to directly and indirectly obtain money from investors through a fraudulent scheme known as "co-op advertising". The evidence also demonstrates that these defendants have utilized misrepresentations and omissions of materi-

---

**15.** The same standard applies to aiders and abettors who will be liable if, in light of the circumstances, they should have been able to conclude that their acts would. have been used in furtherance of the illegal activity. *SEC v. Coven,* 581 F.2d at 1028. As before, this standard of review requires an assessment of the

nature of the defendants' assistance to the primary wrongdoer, the extent of his participation in the challenged conduct, his awareness of the illegal scheme, and any duties to investigate or supervise that may be applicable. See *SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 811 (2d Cir. 1976).

al fact to secure such payments; and while the Commission has not produced an admission of the defendants' specific intent to deceive, scienter can, under the circumstances, reasonably be inferred from their knowledge or reckless disregard of the truth. Cf. *Rolf v. Blyth Eastman Dillon & Co.*, 570 F.2d 38 (2d Cir.), *cert. denied,* —— U.S. ——, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978). As a result, the Commission has met its initial burden of establishing its likelihood of success under Section 17(a) of the 1933 Act; and if the earlier precedent of this Circuit concerning the *mens rea* requirement in SEC injunction actions remains undisturbed, the Commission will also have met its initial burden of proving a strong prima facie case under Section 10(b) and Rule 10b–5. *SEC v. Aaron,* —— F.2d —— No. 77–6091, slip op. (2d Cir. March 12, 1979); *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 854–855 (2d Cir.) *cert. denied sub nom. Coates v. SEC,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Thus, having made a "proper showing", the Securities and Exchange Commission will be entitled to an injunction if a likelihood of recurrence has been shown.

*Likelihood of Continued Violations and Scope of Preliminary Injunctive Relief:*

▆▆▆▆▆ The critical question for a district court deciding whether to issue a preliminary or permanent injunction in view of past securities violations is whether there is a reasonable likelihood that the wrong will be repeated. *Glen-Arden Commodities, Inc. v. Constantino,* 493 F.2d 1027, 1036 (2d Cir. 1974); *SEC v. Culpepper,* 270 F.2d 241, 249 (2d Cir. 1959). In determining whether the SEC has shown a realistic likelihood of recurrence, several general principles have emerged. To begin with, fraudulent conduct in the past will give rise to an inference of continued future violations. *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1100 (2d Cir. 1972); *SEC v. Culpepper,* 270 F.2d at 250. Recent opinions have, however, emphasized that the SEC must go

beyond proof of past violations to demonstrate a reasonable likelihood of recurrence. *SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90, 100 (2d Cir. 1978); *SEC v. Bausch & Lomb, Inc.,* 565 F.2d 8, 18 (2d Cir. 1977); *SEC v. Universal Major Industries,* 546 F.2d 1044, 1048 (2d Cir. 1976). Thus, in addition to establishing past violations, the Commission should be prepared to offer proof concerning (a) the degree of scienter involved, (b) the magnitude and frequency of the violations, (c) whether the defendant continues to maintain that his past conduct was blameless, (d) the sincerity of the defendant's assurances against future violations, and (e) whether future violations can reasonably be anticipated in light of the defendant's professional standing. *SEC v. Universal Major Industries,* 546 F.2d at 1048; *SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d at 100.

No evidence was presented concerning the defendants' assurances against future violations, as none were apparently given, nor has the Commission offered any significant evidence that the defendants' professional standing would be conducive to recurrence. It did, however, make a strong prima facie showing that Ackerman, Haberle and Carter acted with knowledge or reckless disregard of the truth at the time that they employed misrepresentations and omissions of material fact to induce investor participation in the funding of NMOC through "co-op advertising". In addition to showing past violations and a high degree of mental culpability, the Commission has also offered uncontested proof that violations of the registration and antifraud provisions continued on a frequent and regular basis until at least November of 1978. Moreover, the Commission's evidence indicates that while Ackerman viewed "co-op advertising" as a risky venture,[16] Carter expressed enthusiasm for the underlying concept and might reasonably be expected to embark upon a similar enterprise of his own should the opportunity arise.[17] Thus,

---

16. He nonetheless told investors that there were no risks in "co-op advertising".

17. Through his attorney, Carter has argued that he is not a proper subject of preliminary

taken in its entirety, the Commission's proof demonstrates that future violations are reasonably likely in the absence of a preliminary injunction.

 It has long been recognized that the district court has broad discretion to preliminarily enjoin potential future violations of the Securities Acts where past violations and a likelihood of recurrence have been established. *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d at 1100. Nevertheless, recognizing that a securities injunction may operate as more than a "mild prophylactic", the current judicial attitude concerning issuance of an injunction at the SEC's behest has been somewhat more circumspect than in earlier days. *SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 99 (2d Cir. 1978). Consequently, although the district courts enjoy considerable latitude in restraining acts which are of the same type or class as those unlawful acts which the Court has found to have. been committed, *NLRB v. Express Publishing Co.*, 312 U.S. 426, 435, 61 S.Ct. 693, 85 L.Ed. 930 (1941), the nature and extent of the relief granted should not exceed that necessary to adequately protect the public interest. Accordingly, pending a determination of the Commission's application for a permanent injunction, it is hereby

ORDERED, that the defendants Ackerman, Carter, and Haberle, and those persons in active concert or participation with them, directly and indirectly, in the absence of any statutory exemption, be, and hereby are, restrained from:

(a) making use of any means or instruments of transportation or communication in interstate commerce or of the mails, to sell, through the use or medium of any prospectus or otherwise, securities in the form of co-op advertisements or any other security, unless and until a registration statement is in effect with plaintiff Commission as to such securities;

(b) carrying or causing to be carried through the mails or in interstate commerce, securities in the form of co-op advertisements, or any other security, for the purpose of sale or for delivery after sale, unless and until a registration statement is in effect with plaintiff Commission as to such securities; and

(c) making use of any means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or offer to buy, through the use or medium of any prospectus or otherwise, securities in the form of co-op advertisements, or any other security, unless and until a registration statement has been filed with plaintiff Commission as to such securities,

in violation of Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c), and it is further

ORDERED, that pending a determination of the Commission's application for a permanent injunction, the defendants Ackerman, Carter and Haberle, and those persons acting in active concert or participation with them, be and hereby are restrained, directly and indirectly, in connection with the offer, purchase, or sale of securities in the form of co-op advertisements, or any other security, by the use of the means and instruments of transportation or communication in interstate commerce or of the mails, from:

(a) employing any device, scheme, or artifice to defraud;

(b) obtaining money or property by means of, or otherwise making, any untrue statement of material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

injunctive relief because his ties with Paro and NMOC were severed during February of 1978. This argument is, however, unpersuasive as Carter's testimony during the Commission's investigation clearly reveals his proclivity to engage in such activity. This is not to suggest

that Carter bears the burden of showing that his past violations will not be repeated, *SEC v. Coven*, 581 F.2d at 1030–1031 n.18, but merely to point out that the presently available evidence is sufficient to refute this contention.

(c) engaging in any act, transaction, practice, or course of business which operates as a fraud or deceit upon any person,

in violation of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder, 17 C.F.R. 240.10b–5;[18] and it is further,

ORDERED, that the defendants Ackerman and Haberle, and those persons in active concert or participation with them, and each of them, be, and hereby are, preliminarily restrained from, directly or indirectly:

(a) transferring, setting off, changing, selling, pledging, assigning, liquidating, dissipating, concealing, or otherwise disposing of, any assets or property owned or controlled by, or in the possession of, defendants Paro and NMOC; in any manner which:

(i) is not necessary to the continuation of the defendants' legal business operations;[19] and,

(ii) would make a final order of this Court ineffectual.

(b) destroying, mutilating, concealing, altering or disposing of, any of the books, records, documents, correspondence, brochures, manuals, obligations or other property of defendants Paro and NMOC;

until further Order of this Court.

It is so ordered.

---

**18.** During several discussions of this case in chambers, Carter's counsel has indicated that his client previously entered judgment against Paro and NMOC, Inc. in the New York courts. This judgment apparently embodies a claim for commissions which Carter allegedly earned in the "co-op advertising" scheme.

As noted at the outset, Paro and NMOC, Inc. have entered into a consent decree whereby Paro's remaining assets will be managed through an escrow agent pending a final determination of the Commission's application for an order directing disgorgement. Since the claims of investors apparently exceed Paro's assets, enforcement of Carter's judgment before their claims have been satisfied would permit him to reap the benefits of his misconduct at the expense of innocent investors, thereby defeating the broad remedial purposes of the Securities Acts and rendering a final judgment of this Court ineffectual. While the Second Circuit has held that the Anti-Injunction Act (28 U.S.C. § 2283) will not preclude the SEC from enjoining state court actions which constitute a direct assault on a District Court judgment, *International Controls Corp. v. Vesco*, 490 F.2d at 1352, or which by their very nature further a violation of the Securities Act, *Studebaker Corp. v. Gittlin*, 360 F.2d 692 (2d Cir. 1966), the evidence presented at this stage is inadequate to permit anything beyond sheer speculation. The Court shall therefore entertain an application pursuant to F.R.Civ.P. 60(b) if a proper legal and evidentiary showing reveals the necessity of a modification as aforesaid.

**19.** This shall not preclude the payment of legal fees and disbursements incurred in connection with this proceeding.